## Cincinnati, N. & C. Ry. Co. v. City of Bellevue.

May 27, 1941.

Stephens L. Blakely for appellant.

William J. Wise for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

The Cincinnati, Newport and Covington Railway Company and its predecessors have operated a transportation system in the numerous Northern Kentucky cities and across the Ohio River to Cincinnati for many years. At first the streetcars were horse-drawn; later electric streetcars were installed; while now, mostly trolley buses and motor coaches are in use. The change from electric streetcars to trolley buses and motor coaches has been approved by the Interstate Commerce Commission, in so far as interstate business is concerned, and by the Public Service Commission of Kentucky, in so far as intrastate business is concerned. Four thousand feet of the Company's approximately eighty-three route miles are within the City of Bellevue. Bellevue lies between Newport on the west and Dayton on the east. One of the Company's lines, which runs from Dayton to Cincinnati, passes through Bellevue and Newport. Motor coaches are operated on this line. Following the installation of motor coaches on this line, Bellevue instituted this action to enjoin the Company from operating them and to have it reinstate the operation of electric streetcars under a franchise which became effective in November, 1936. The trial resulted in a judgment under which the Company was enjoined from operating motor coaches over the Bellevue-Dayton route through Bellevue, and under which it was ordered to furnish to the citizens of Bellevue streetcar service on the line in question from Bellevue to Cincinnati and return.

In appealing from that judgment the Company is insisting that it is erroneous in that it attempts to interrupt the flow of interstate commerce; that the 1936

Bellevue franchise authorized the substitution of motor coaches for electric streetcars; and that the Public Service Commission, which has jurisdiction over such matters, has approved the substitution.

The City does not question the power of the Public Service Commission to authorize the substitution of motor coaches for electric streetcars, but it insists that such authorization does not supersede any contract existing between the City and the Company as to the character of transportation service. It is obvious that the City is taking the position that the 1936 franchise does not lend itself to the interpretation of authorizing the Company to substitute motor coaches for all of its electric streetcars.

That the transportation service for the citizens of Bellevue has been improved by the installation of motor coaches seems beyond dispute to us. New and modern equipment has been substituted for obsolete equipment. More vehicles are operated now, and a faster schedule is maintained. Furthermore, few would contend that streets without streetcar rails are not more convenient and safer for the traveling public. The bone of contention seems to be that the City is pursuing the course indicated above because of an increase in fare, which was put into effect upon the installation of the new transportation equipment. We have, therefore, an indirect attempt to regulate rates upon a demand for specific performance of an alleged contract.

We can not agree with the City's interpretation of the powers of the Public Service Commission as to the regulation of transportation service and the facilities therefor; but we deem it unnecessary to enter upon a discussion of that question, since it is our view that a reasonable interpretation of the 1936 franchise will uphold the position of the Company. It follows also that it is unnecessary to discuss the question raised by the Company as to the difference between a right or obligation existing under a franchise as against a contract.

The preamble of the 1936 franchise sets forth that it was designed to provide for a compromise of certain controversies involving rates existing between the City and the Company. The first section of the franchise sets forth that it applies to the operation of streetcars within Bellevue upon lines where such cars were operated by

the Company under all existing grants or franchises. The second section relates to rates. The third relates to transfers for intrastate passengers. The first paragraph of Section 4 is as follows:

"(a) To the end that the public shall have reasonably adequate accommodations and service, The Cincinnati, Newport and Covington Railway Company shall operate buses propelled by gasoline, electricity, or other improved means, when reasonably necessary to improve and supplement its service upon all the lines where streetcars are now operated by The Cincinnati, Newport and Covington Railway Company under any and all existing unexpired grants or franchises."

The subject matter contained in Sections 5, 6, 7 and 8 does not concern us herein.

The program inaugurated by the Company to modernize its transportation system is in line with programs inaugurated by similar companies throughout this country. The history of the Company's operations from horse-drawn cars to electric streetcars, to trolley buses and motor coaches, parallels the development of municipal transportation systems. The increased use of the automobile and the necessity for the speeding up of traffic in metropolitan areas have demanded a system of transportation more flexible than that furnished by electric streetcars operated upon rails. Certainly this was generally known in 1936. It is reasonable to assume that the officials of the Company knew at that time that, if they were to stay in the transportation business and render reasonably adequate service for their customers, they would be called upon to abandon their obsolete equipment. As indicated, we think the part of Section 4 of the 1936 franchise heretofore quoted lends itself to the interpretation that within the period of its life (seven years), the transportation system would have to be improved and supplemented by the substitution of trolley buses or motor coaches for electric streetcars. We think Section 4 of the franchise authorized such a substitution, to say nothing of the authorization granted to the Company by the Public Service Commission. The City stresses the technical definitions of the words, "improve," "supplement" and "substitute." We are not concerned with such definitions, since, as we have indicated, we think the part of the franchise in question

clearly lends itself to the interpretation that the Company was authorized to make the substitution of equipment against which the City has directed its complaint.

It follows that it is our view that the judgment of the lower court is erroneous. We therefore direct that it be set aside and that a judgment be entered in conformity with this opinion.